UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY BERRY FOSTER,

      Plaintiff,                      Civil Action No. 18-10226

          v.                    District Judge Nancy G. Edmunds
                                    Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## **REPORT AND RECOMMENDATION**

Plaintiff Anthony Berry Foster ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging Defendant Commissioner's ("Defendant's") denial of his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") brought respectively under Titles II and XVI of the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #18] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

## PROCEDURAL HISTORY

On June 13, 2012, Plaintiff applied for DIB and SSI, alleging disability as of May 4, 2012 (Tr. 318, 325).  Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on July 8, 2013 (Tr. 132-177).  On August 23, 2013, Administrative Law Judge ("ALJ") Michael F. Wilenkin found that Plaintiff was capable of performing his past relevant work as a security guard and computer assembler (Tr. 198-209).  On April 2, 2015, the Appeals Council remanded the case for further fact-finding (Tr. 215-217).  The Appeals Council ordered further evaluation of "the severity and limiting effects" of Plaintiff's mental disorders, noting that the questioning to the Vocational Expert did not contain a "function-by-function" assessment of his work-related mental capabilities (Tr. 215).  The Appeals Counsel noted that the finding that Plaintiff could perform his past relevant work did not take into account the his allegations of mental limitations (Tr. 216).  The Council also  noted while the ALJ acknowledged the impairments of neck and low back pain, the RFC did not reflect corresponding limitations (Tr. 216).  The ALJ was directed to take additional vocational testimony and offer Plaintiff an opportunity for further hearing before issuing a new decision (Tr. 216-217).

A second hearing was held on August 27, 2015 in Detroit, Michigan (Tr. 39-131).  Administrative Law Judge ("ALJ") J. William Callahan presided (Tr. 39).  Plaintiff, represented by attorney Andrea Hamm, testified (Tr. 46-114), as did Vocational Expert ("VE") Pauline Pegram (Tr. 115-130).  On June 10, 2016, ALJ Callahan found that Plaintiff

was not disabled, finding that while he unable to perform any past relevant work, he was capable of a significant range of other work (Tr. 21-33). On December 5, 2017, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review in this Court on January 19, 2018.

## **BACKGROUND FACTS**

Plaintiff, born January 26, 1978, was 38 at the time of the administrative determination (Tr. 33, 318). He completed 11th grade, completed a specialized training in computer design, and worked previously as an account manager, "houseman and porter," machinist, security guard, temporary office worker, stocker, and web designer (Tr. 369-370). His application for benefits lists chronic pain of the neck, back, and arm as sources of disability (Tr. 369).

### A. Plaintiff's Testimony (August 27, 2015 hearing)

Plaintiff offered the following testimony:

He lived with his girlfriend in Ferndale, Michigan (Tr. 46). He had a GED (Tr. 47). He did not drive due to a diagnosis of epilepsy (Tr. 48). He had a seizure two months earlier (Tr. 49). He supported himself by doing "odd jobs," including work with his computer, producing music, and selling assets (Tr. 49). He had been experiencing intermittent epileptic seizures for the past two years (Tr. 53). He state that his long-term failure to procure a driver's license (prior to the seizure activity) was due to his lack of comfort in driving (Tr. 55).

Plaintiff's past work included rebuilding and assembling laptop computers (Tr. 56). His skills were "self-taught" (Tr. 56). He also worked as a forklift operator (Tr. 56-57). He had sustained injuries in several car accidents but had never made claims to the insurance company (Tr. 58). A treating source had told him that he was experiencing seizures due to adverse drug interactions (Tr. 60). He received family care from several different physicians (Tr. 64). He had underwent a cervical spine fusion in June, 2012 after sustaining injuries in a car accident (Tr. 67). He experienced low back pain and eye problems (Tr. 67). He experienced regular spasms in all extremities and dizziness (Tr. 68). He experienced dizziness when walking for any distance (Tr. 84). He took muscle relaxers for the spasms and pain (Tr. 81). He stopped taking Norco due to the side effect of grogginess (Tr. 81). He had recently been approved for an MRI of the lumbar spine but had not undergone the MRI due to preoccupation with other health problems (Tr. 71-72). In his household, Plaintiff was responsible for laundry chores, noting that his girlfriend had just given birth to their twin sons (Tr. 73).

In addition to the physical problems, Plaintiff experienced Post Traumatic Stress Disorder ("PTSD") and schizophrenia (Tr. 69). He experienced PTSD after witnessing "murders" in high school, but did not take medication for that condition (Tr. 85). He suffered from schizophrenia starting in 2005 when his mother passed away (Tr. 85). The schizophrenia caused him to "hear and see things" (Tr. 86). He was attending therapy (Tr. 86). His current psychotropic medications included Trazodone, Seroquel, and Latuda (Tr.

-4-

86). The symptoms of schizophrenia were "on and off" but had not increased or lessened since 2005 (Tr. 86). He sought treatment at times that he felt that the condition was affecting his "daily social life" (Tr. 87). He did not take his prescribed medication every day due to his belief that if he took all of his medications, he would be unable to get out of bed (Tr. 87). He generally slept between five and seven hours each night (Tr. 88, 101). He smoked one pack of cigarettes a week (Tr. 88).

In response to questioning by his counsel, Plaintiff stated that he took the muscle relaxer as needed about twice or three times a week (Tr. 92). He took the relaxers for locking of the hand joints, legs, arms, and jaw (Tr. 92). The muscle relaxers worked within 30 minutes (Tr. 92). He did not take pain medication orally but used a patch on a daily basis to quell pain of the extremities, particularly his left leg (Tr. 93). He coped with pain by reclining, massage, medication, and eating (Tr. 94). He experienced relief 30 minutes to an hour after taking medication (Tr. 94). He was able to stand for up to 45 minutes, sit for 60, and walk for 20 (Tr. 95-96). He could walk six blocks before requiring a 20 to 30-minute break (Tr. 96). He could lift at least 20 pounds (Tr. 98). He could perform household chores for up to 30 minutes before requiring a break (Tr. 99). He often reclined during his rest periods (Tr. 299-300).

Plaintiff reported that he sometimes heard voices "talking outside . . . [his] door" (Tr. 102). The auditory hallucinations had been occurring as far back as middle school (Tr. 103). Recently, the voices had "faded away" but he did not know if that was due to his medication

(Tr. 103).  He experienced crying spells three times a month for unknown reasons (Tr. 104).

He did not experience problems getting along with others (Tr. 104).  He had friends but did

not interact with them regularly (Tr. 105).  He spent one or two hours each day on music

production (Tr. 105-106).  He charged $25 an hour for his services as a music producer and

used a lap top and multiple applications for music production (Tr. 110).  He received money

for his music production (Tr. 106).  He experienced concentrational and memory problems

due to the seizures and extreme pain occurring around three days a week (Tr. 107). Although

during the hearing he sat for one hour and 40 minutes without a break, he experienced only

moderate pain (Tr. 109, 114).

### B. Medical Evidence[1]

#### 1. Treating Sources

January, 2010 records by the Wayne County Jail state that Plaintiff reported "blurry"

right eye vision (Tr. 437).   A mental status examination was unremarkable (Tr. 444, 449).

Plaintiff reported a mental health history of a mental breakdown the previous month in which

he attempted suicide by walking into traffic (Tr. 446, 452).   He was currently taking

Wellbutrin (Tr. 446).  Following his examination, he was placed in the general jail population

(Tr. 453).

---

Medical records significantly predating  alleged onset date of May 4, 2012, where
discussed, are included for background purposes only.

In June, 2012, Plaintiff sought emergency treatment for neck pain and left arm pain and numbness after a car that he was driving was struck by another car (Tr. 513, 519, 521). He was discharged with pain medication and a soft collar (Tr. 513, 520).  He exhibited decreased left hand grip (Tr. 520).  Imaging studies were negative for spinal cord compression (Tr. 520).  As CT of the lumbar spine was also negative (Tr. 521).  An MRI of the cervical spine showed a disc protrusion (herniation) causing narrowing of the left neural foramen at C6-C7 with no other abnormalities (Tr. 540-541).  Plaintiff underwent a cervical discectomy and fusion later the same month (Tr. 541, 564-566).  He was cleared for discharge two days after surgery (Tr. 541).  Records from the day of discharge show 5/5 extremity strength (Tr. 541).  Imaging studies performed following surgery were unremarkable (Tr. 572).  September, 2012 imaging studies of the lumbar spine taken in response to Plaintiff's report of low back pain showed only minimal degenerative changes (Tr. 600, 704).

Mental health records from August and September, 2012 state that Plaintiff was currently homeless with economic problems (Tr. 603, 605). He was diagnosed with a mood disorder and assigned a GAF of 50[2] (Tr. 604).  His prognosis was deemed "good" (Tr. 605). October, 2012 records note that Plaintiff had missed an appointment and reported that he became "confused a lot" (Tr. 609).

---

[2]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM-IV-TR*.

October, 2012 post-surgical treating records note that imaging studies had been unremarkable (Tr. 610). The notes state that as of July, 2012, Plaintiff reported that he was "doing okay" with reduced neck and arm pain limited to "occasional" (Tr. 610, 614) and as of July, 2012, he was advised not to do any heavy lifting or contact sports for a few more months (Tr. 610). The October, 2012 records note that Plaintiff later complained of sharp, stabbing pain at the site of incision (Tr. 610). Mental health treating notes from the same month state that Plaintiff denied suicidal ideation or delusions (Tr. 686). In December, 2012, Plaintiff was a "walk in" for a therapy session (Tr. 678). Treating records note that he had missed his last two appointments but said he was "doing pretty good" but with "too much going on" he was unable to keep appointments (Tr. 678).

In January, 2013, Plaintiff sought emergency treatment after telling a friend that he had taken too many Tylenol #3s (Tr. 641). He was awake, alert, and "confused" (Tr. 641). He denied a suicide attempt (Tr. 641). Mental health treating records from the same month note Plaintiff's report of mood swings, agitation, and auditory hallucinations, including his deceased mother's voice (Tr. 673). He noted that he was trying to gain custody of his five children (Tr. 673). He was assigned a GAF of 65[3]  (Tr. 674).

---

[3]GAF scores in the range of 61 to 70 suggest "some mild symptoms or some difficulty in social, occupational, or school functioning." *DSM–IV–TR* at 34.

April, 2013 neurosurgery records note Plaintiff's report of lumbar spine pain (Tr. 688). He was prescribed physical therapy (Tr. 690). A physical examination was unremarkable (Tr. 690). Imaging studies showed moderate facet arthropathy at C7-T1 but were otherwise unremarkable (Tr. 693). In May, 2013 Plaintiff sought emergency treatment for back pain and lower extremity numbness (Tr. 635-637). He was observed walking without a cane and was noted to have traveled on foot to the emergency room (Tr. 635, 637-638). He reported "chronic, stable" upper left extremity numbness but was noted to be making a "noticeable poor physical effort" in an attempt to overstate his upper extremity limitations (Tr. 639). Therapy records from the same month state that Plaintiff was interested in doing carpentry, maintenance or security work (Tr. 715). June, 2013 imaging studies of the left hip were within normal limits (Tr. 703).

Mental health treating records from the same month note that Plaintiff was cooperative, pleasant, fully oriented, appropriately groomed, and displayed a normal affect (Tr. 714). The following month, Plaintiff reported "bad headaches" for the past three weeks (Tr. 842). An MRI of the brain was unremarkable (Tr. 852, 921). August, 2013 records note "no . . . indication . . . that he has any form of serious mental illness" (Tr. 784). August, 2013 mental health records showed a GAF of 55[4] (Tr. 966, 995). A source found that "no mental restrictions [were] apparent" (Tr. 723). Plaintiff reported that he "self medicate[d]" with

---

[4]A GAF score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

marijuana (Tr. 962).  Plaintiff was discharged from therapy in September, 2013 after failing to show up for appointments (Tr. 725-726, 996).  Ophthalmological notes from the same month note Plaintiff report of "blurry" vision in both eyes (Tr. 902).

April, 2014 mental health records note the absence of psychosis (Tr. 986).  May, 2014 mental health records note that Plaintiff continued to miss appointments (Tr.  990-993).  June, 2014 emergency room records by Botsford Hospital note that a CT of the brain was unremarkable (Tr. 1034, 1012).  He appeared "alert and oriented" (Tr. 1035).  July, 2014 emergency treatment records note Plaintiff's allegation that he had passed out and was having "suicidal and homicidal thoughts" after receiving unsatisfactory emergency room treatment (Tr. 740, 749).  He was placed on "seizure precautions" but appeared otherwise unremarkable and was seen "eating and drinking without any problems" (Tr. 740-741).  An EEG and EKG were possibly consistent with "primary generalized epilepsy (Tr. 749, 751, 849).  He was advised to lose weight (Tr. 750).  In August, 2014, Plaintiff sought emergency treatment for dizziness, noting that he had not slept in 36 hours after attending a concert then going to a scheduled medical appointment (Tr. 999).  Mental health treating records note that he had lost custody of his children (Tr. 969, 971).

In January, 2015, Plaintiff reported that he wanted a job (Tr. 813-815).  He reported "multiple arrests" for traffic warrants and drug charges (Tr. 969).  February, 2015 mental health records note full orientation (Tr. 808).  Plaintiff reported intact memory and well organized thoughts (Tr. 808-809). He denied hallucinations (Tr. 809).  A March, 2015

psychiatric medication review notes Plaintiff's report of sleep disturbances but no new physical problems (Tr. 796). His condition was deemed stable (Tr. 797). Neurological examination records from the same month note allegations of memory problems (Tr. 835). A physical examination was unremarkable (Tr. 836-837). Imaging studies of the lumbar and cervical spine were essentially unremarkable (Tr. 845-847, 917-918, 919-920).

The following month, Plaintiff complained of neck pain that was deemed "muscular" in nature (Tr. 914-915). His request for additional pain medication was denied (Tr. 915). Mental health records note the absence of psychosis (Tr. 986). The same month, treating records note that Plaintiff was non-compliant with anti-seizure medication (Tr. 832-833). A June, 2015 medication review notes Plaintiff's report that Seroquel made him sleepy (Tr. 981). A July, 2015 neurological examination noted the denial of recent seizures and non-compliance with seizure medication (Tr. 829). Plaintiff failed to submit to a followup EEG (Tr. 829). MRIs of the cervical and lumbar spine were ordered (Tr. 862). A physical examination was unremarkable (Tr. 830).

## 2. Non-Treating Sources

An August, 2012 non-examining assessment performed by Mahammad Khalid on behalf of the SSA found that Plaintiff could lift 10 pounds frequently and 20 occasionally; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr.183). He limited Plaintiff to occasional postural activity (Tr. 183).

In May, 2013, T.H. Kang, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of ongoing neck pain and the inability to sit, stand, or walk for more than two hours at a time (Tr. 616-619). Plaintiff stated that his driver's license had been suspended (Tr. 616). He exhibited good coordination and full muscle strength (Tr. 617). A neurological examination was unremarkable (Tr. 617). He exhibited a "limited and painful" range of lumbar spine motion (Tr. 618, 622). He was able to sit, stand, and walk without difficulty (Tr. 618). Imaging studies of the cervical spine showed evidence of a discectomy at C6-C7 (Tr. 619). Imaging studies of the lumbar spine showed only minimal osteoarthritis changes and minimal narrowing at L5-S1 (Tr. 619). An examination revealed no functional limitations (Tr. 620-621). Dr. Kang found that Plaintiff could lift up to 10 pounds continuously; 11 to 20 pounds frequently; and up to 50 pounds occasionally (Tr. 624). She found that Plaintiff could sit, stand, or walk for up to one hour at a time and sit for a total of eight hours in a workday and stand/walk for six (Tr. 625). She found no limitations in reaching (Tr. 626). She limited Plaintiff to occasional postural activity (Tr. 627). She precluded all work involving unprotected heights but found that Plaintiff could otherwise be exposed to environmental conditions on an occasional basis (Tr. 628). She found no physical limitations in activities of daily living (Tr. 629).

In June, 2015, ALJ Callahan mailed interrogatories to Dr. Anderson regarding Plaintiff's psychological limitations (Tr. 729-734). Interrogatory responses by Richard M. Anderson, Ph.D. made after reviewing the treating records state that Plaintiff's limitations

as a result of a mood disorder, psychotic disorder, and schizophrenia were "minimal" and that

"no mental restrictions [were] apparent" (Tr. 721, 723).  He found that Plaintiff did not meet

or medically equal a listed impairment (Tr. 721).  In March, 2016, Leslie O'Meara, M.D.,

responded to interrogatory requests by ALJ Cahallan, stating that based on her review of the

physical and psychological treating records, Plaintiff's conditions did not meet or medically

equal a listed impairment (Tr. 1071).  She noted that the mental health diagnoses were

"considered minimal" and that he did not experience mental restrictions (Tr. 1071).  She

noted that an MRI of the brain was unremarkable and that his complaints of low back pain

were inconsistent with examination records noting a normal gait and "poor effort" (Tr. 1071).

She found that he should avoid work around unprotected heights, ladders, scaffolding, heavy

machinery, and avoid driving (Tr. 1072).

### C.  Vocational Expert Testimony (August 27, 2015 hearing)

VE Pegram classified Plaintiff's past relevant work as an applications programmer

as skilled and exertionally sedentary; audio production specialist and computer sales

representative as skilled/light; security guard, computer assembler, and waiter,

semiskilled/light; office helper, unskilled/light; machine tender and fork-lift truck operator,

semiskilled/medium; and stock selector and porter, unskilled/medium [5] (Tr. 118, 426).

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;"  *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and

Plaintiff reported that he performed his former work as a music producer (audio production specialist) in a mostly sitting position (Tr. 119).  The VE found the existence of 10,000 jobs nationally and 300 in Michigan for the position of audio production (Tr. 122).  The ALJ posed the following set of limitations:

> [With an [Residual Functional Capacity] of light; with a sit/stand option being required; standing limited to 30 to 45 minutes at a time; sitting limited to one hour at a time; walking limited to six blocks at a time; lifting or carrying limited to 20 pounds occasionally, 10 pounds frequently. Should avoid extremes in range of motion of the neck; no limitation on fine or gross manipulation; and limited to no crawling; no climbing ladders, ropes, or scaffolds; and occasional climbing of ramps or stairs, balancing, stooping, kneeling, or crouching.  Could he perform his past work?  (Tr. 122-123).

The VE testified that given the above limitations, the individual  could perform Plaintiff's past relevant work as a sales representative, office helper, computer assembler, and audio production specialist (Tr. 123).   She testified that if the same individual were additionally limited to simple work and needed to be off task 15 percent of the workday, all work would be eliminated, but if the above hypothetical limitations were applied to an individual of Plaintiff's education, and past work and who was off task *10 percent* of the workday, they could allow for the light, unskilled work of an assembler (42,400 in the national economy) and hand packager (46,000) (Tr. 124-125).   She testified that if the above-described individual were further limited to sedentary work with a sit/stand option, the individual could

---

that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

perform the work of a inspector/tester, sorter (20,000); packager/filler (10,000); and document preparation clerk (37,000) (Tr. 127). She testified that a limitation to vision in one eye would not affect the job findings except for the former job of security guard (Tr. 128-129). In response to questioning by Plaintiff counsel, the VE testified that the need to elevate the legs to hip level periodically during the workday, or, the need to be absent from work two or more days a month would preclude all competitive work (Tr. 130).

### D.    The ALJ's Decision

Citing the medical records, ALJ Callahan found that Plaintiff experienced the severe impairments of "mood disorder, not otherwise specified; psychologic disorder, not otherwise specified; lumbar foramina stenosis; and cervical degenerative disc disease," but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 24). He found that the alleged condition of epilepsy was a "non-medically determinable impairment," noting no evidence from an acceptable medical source to support the diagnosis (Tr. 24). He found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 25-26). The ALJ found that Plaintiff had a Residual Functional Capacity ("RFC") for sedentary work with the following non-exertional limitations:

> [C]laimant would need a sit/stand option every [ ] hour. He could stand for 45 minutes at a time and sit for one hour at a time. He could walk six blocks at a time. He could lift 20 pounds occasionally and 10 pounds frequently. He should avoid extremes in range of motion of his neck. He should never climb ladders, ropes, or scaffolds. He could never crawl. He could occasionally climb ramps and stairs. He could occasionally balance, stoop, kneel, crouch,

-15-

and crawl.  He is limited to simple, routine, repetitive tasks.  He would be off
task 10 percent of the time in addition to normal breaks.  The claimant has
monocular vision, meaning he has vision from only one eye (Tr. 27).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the sedentary,
unskilled work of an inspector, packager, and document preparer (Tr. 33).

The ALJ discounted Plaintiff's allegations of  disability.   He noted that while
Plaintiff underwent a cervical disectomy and fusion in June, 2012 (one month after the
alleged onset of disability date), subsequent findings showing reduced neck and arm pain and
the unremarkable imaging studies did not support the allegations disabling neck pain (Tr. 28-
29).  He cited treating records stating that Plaintiff's low back pain could be managed with
physical therapy and analgesics and treating records noting "minimal difficulty" walking (Tr.
28).  He noted that imaging studies of the lumbar spine showed only minimal degenerative
changes (Tr. 28).

The ALJ cited treating records noting that Plaintiff's allegations of limitation were
inconsistent with the imaging findings and that Plaintiff demonstrated "poor effort" during
an examination (Tr. 28).  The ALJ noted that Plaintiff's testimony that he was too busy to get
an MRI and his  report that he worked two hours a day in audio production and other part-
time jobs undermined his claim that his medical conditions forced him to recline for long
periods during the day (Tr. 30).  The ALJ noted that Plaintiff's testimony that he was unable
to sit for extended periods was contradicted by his ability to sit through a 100-minute hearing
(Tr. 30).

-16-

As to the alleged mental limitations, the ALJ noted that Plaintiff's treatment had been "sporadic and inconsistent" (Tr. 29). He noted the absence of inpatient or emergency/urgent treatment for psychological problems (Tr. 29). He noted that Plaintiff was independent in self-care and activities of daily living (Tr. 29).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATION

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes four arguments for remand.  He contends first that the ALJ erred by "his rejection and minimization of the opinion" of the treating source opinions.  *Plaintiff's Brief,* iv, 12-15, *Docket #15,* Pg ID 1149.  He argues second that the ALJ's findings are undermined by the absence of a recent consultative examination.  *Id.* at 15-17.    Third, he faults the ALJ for failing to perform a "function-by-function" analysis of Plaintiff's mental

-18-

abilities as required by SSR 96-8p.  *Id.* at 17-19.  Fourth, again citing SSR 96-8p, he contends that the ALJ's finding that he could meet the mental demands of full-time, unskilled worked was "conclusory." *Id.* at 19-21.

Plaintiff's third and fourth arguments, pertaining to the ALJ's findings regarding his mental abilities,  are both based on the requirements of SSR 96-8p and will be considered in tandem.

### A.  The ALJ's Discussion of the Treating Records

Plaintiff contends that the ALJ erred by "rejecting" the records and opinions of his treating sources.  *Plaintiff's Brief* at 12.  Specifically, Plaintiff takes issue with the ALJ's finding of "mild" limitations resulting from the neck condition, noting that his treating sources saw fit to perform a cervical discectomy and fusion "due to the severity of [the] neck condition." *Id.* at 14.

Plaintiff is correct that case law in effect at the time of his application requires that "if the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. CSS*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2)); *see also* SSR 96–2p, 1996 WL

-19-

374188, at *5 (July 2, 1996).[6]  However, Plaintiff's argument fails for two separate reasons. First, the "treating physician rule" according controlling deference to a treating opinion is restricted to the *opinions* by an acceptable treating source regarding a claimant's physical or mental limitations. § 404.1527(c)(2).  While the fact that Plaintiff required aggressive treatment for the neck condition could lend support his allegations of disability, his physician's decision to proceed with surgery does not constitute an "opinion" as to Plaintiff's functional capacity.  Therefore, the treating physician rule does not apply.  *See Bennett v. Commissioner of Social Security*, 2011 WL 1230526 (W.D.Mich. March 31, 2011) (doctor's observation, unaccompanied by an assessment of functional limitations not a "medical opinion"); *Winter v. Commissioner of Social Security*, 2013 WL 4604782 (E.D.Mich. August 29, 2013) (diagnosis, by itself, does not constitute an "opinion").  Accordingly, the ALJ's purported failure to apply the treating physician rule does not constitute error.

Second, the ALJ's observation that the treating records reflected "mild" findings as to the neck condition and Plaintiff's physical condition in general reflects the record as a whole (Tr. 28).  Plaintiff's assertion that the ALJ's "mild" findings stand at odds with the

---

[6]The administration rescinded SSR 96-2p on March 27, 2017. *See Rescission of Social Security Rulings* 96-2p, 96-5p, and 06-3p, 82 FR 15263-01 (Mar. 17, 2017). Under the new rules, ALJs will weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. §§ 404.1520b; 416.920c. The "new rules, however, apply only to claims filed on or after March 17, 2017." *Hancock v. Commissioner of Social Security*, 2017 WL 2838237, at *8 (W.D. Mich. July 3, 2017)(*citing Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01 (Jan 18, 2017) ). Because current Plaintiff filed his claim well before March 17, 2017, SSR 96-2p would apply.

need for a cervical discectomy and fusion is based on a distortion of the record. Plaintiff fails to mention that (as a result of a June, 2012 car accident) he underwent the neck surgery approximately seven weeks after the May 4, 2012 alleged onset of disability (Tr. 564-566). While the MRI of the cervical spine taken prior to surgery show a herniation at C6-C7, the post surgical imaging studies were unremarkable, and as of July, 2012, Plaintiff reported only occasional neck and arm pain (Tr. 572, 610, 614).   Substantial evidence supports the conclusion that the neck condition, brought on by a June, 2012 car accident, did not cause disabling limitations for a continuous 12-month period as required by 42 U.S.C. § 423(d)(1)(A).   The ALJ's finding that Plaintiff experienced at most mild limitations following the June, 2012 surgery (Tr. 28) is well supported and reflected in the RFC limiting Plaintiff to exertionally sedentary work (Tr. 27).   Further, while several months later Plaintiff later alleged ongoing neck pain, the ALJ noted that the claims were undermined by normal imagining studies,  treating records noting a normal range of motion, unremarkable neurological findings, and Plaintiff's  "poor effort" in muscle strength testing in an attempt to exaggerate his upper extremity limitations (Tr. 28, 639).

Because substantial evidence supports the ALJ's finding that Plaintiff's neck limitations were at most mild following the June, 2012 surgery, a remand on this basis is not warranted.

### B.  An Updated Consultative Examination

Plaintiff argues second that the ALJ ought to have ordered a consultative examination given the four-year gap between Plaintiff's application for benefits and the June, 2016 administrative opinion.  *Plaintiff's Brief* at 15-17.  Citing SSR 96-6p, he notes that since the case was remanded by the Appeals Council for a second hearing, 94 pages of treating records were added to the file, necessitating the need for further evaluation.  *Id.* at 16.  He argues, in effect, that an August, 2012 finding that he did not medically equal a listed impairment should be revisited given his subsequent psychological history.  *Id.*

Under SSR 96–6p, 1996 WL 374180, *3 (July 2, 1996) a Step Three finding that a claimant does not medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 must be supported by a medical opinion.  Plaintiff relies on the portion of SSR 96-6p which states that an ALJ "must obtain an updated medical opinion from a medical expert . . . . [w]hen additional medical evidence is received that in the opinion of the administrative law judge . . . may change [a previous  agency finding] that the alleged "impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  *Id.* at *3–4 .

Plaintiff's argument that the ALJ was required to order a consultative examination for an  evaluation of the psychological limitations is not well taken.  First, SSR 96-6p does not mandate a consultative examination  but rather,  an "updated medical opinion" where new evidence supports a possible change in the previous Step Three finding.  *Id.* at *4.  ALJ

Callahan did just that.  In June, 2015, he mailed interrogatories to Dr. Anderson regarding Plaintiff's psychological limitations (Tr. 729-734),  in response to which Dr. Anderson opined that  Plaintiff did not meet or medically equal a listed mental impairment  and that the psychological symptoms were "minimal" with "no mental restrictions" (Tr. 721, 723).  This is consistent with my own review of the psychological treating records reflecting an unremarkable mental state.  *See* II.B.1, *supra.*

Likewise, as to the alleged physical restrictions, Dr. O'Meara, M.D. responded to interrogatory requests by ALJ Cahallan in March, 2016, stating that none of Plaintiff's conditions met or medically equaled a listed impairment (Tr. 1071).  She also noted that the mental health diagnoses were "considered minimal" and that he did not experience mental restrictions (Tr. 1071).   Because the ALJ sought and received updated opinions as to whether Plaintiff equaled a listed impairment, consistent the requirements of SSR 96-6p, the argument that a consultative examination was required should be rejected.  It is well settled that determination of whether a consultative examination is necessary is within the discretion of the ALJ and appropriate only where the existing record "is insufficient or inconsistent." 20 C.F.R. §§ 404.1520b, 404.1520b(c)(3).  In this case, Plaintiff has shown neither.

### C.  The RFC (Plaintiff's Third and Fourth Arguments)

In his third argument, Plaintiff argues that the RFC does not reflect his actual degree of psychological limitation.  *Plaintiff's Brief* at 17-19.  He claims also that ALJ failed to provide a sufficient rationale for declining accept his allegations of limitation.  *Id.*

Specifically, he contends that the ALJ failed to address the treating mental health records showing disability level psychological limitation, but instead noted irrelevantly that Plaintiff was capable of performing skilled work on a part-time basis. *Id.* at 18. Similarly in Plaintiff's fourth argument, he contends that the ALJ failed to provide support for the finding that the psychological limitations were not disabling. *Id.* at 18-19.

"RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184 at *2. (July 2, 1996). "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. *Id.* at *7. The analysis must include the alleged psychological and physical limitations. 20 C.F.R. §§ 404.1545, 416.945. In crafting the RFC, the ALJ must consider how the psychological limitations affect the ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p at *6. However, "'[a]lthough a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing.'" *Delgado v.CSS*, 30 Fed.Appx. 542, 547–548, 2002 WL 343402, at *5 (6th Cir. March 4, 2002)(*citing Bencivengo v. CSS*, 251 F.3d 153, slip op., 4 (Table)(3rd Cir. December 19, 2000)(punctuation added)). " '[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to

perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (*citing Bencivengo* at slip op. at 5).

Plaintiff's argument that the ALJ failed to adequately explain the choice and degree of psychological limitation found in the RFC is flatly contradicted by the administrative findings.[7] The ALJ noted that Plaintiff had not required inpatient treatment or sought emergency psychological care during the relevant period (Tr. 29). The ALJ noted that Plaintiff's treatment had been "sporadic and inconsistent" (Tr. 29). The ALJ observed that Plaintiff was independent in self-care and activities of daily living and that none of the treating sources had "imposed specific restrictions or offered limitations" related to Plaintiff's ability to perform unskilled work (Tr. 29). He cited mental status examinations showing that Plaintiff was cooperative with a goal directed thought process and full orientation (Tr. 29). The treating records noting a goal directed thought process, coupled with Plaintiff's ability to perform a variety of activities on a daily basis, supports the conclusion that he had the judgment to make simple "work-related decisions" and deal with

---

[7] I have also considered Plaintiff's citation to SSR 85-15, which states in relevant part that "basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." 1985 WL 56857, at *4 (1985). SSR 85-15 notes that a "substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." For the same reason that the ALJ's lengthy discussion of the treating records and daily activities in support of the RFC satisfies the requirements of SSR 96-8p, the requirements of SSR 85-15 are met.

"changes in a routine work setting." Likewise, the records showing that Plaintiff was consistently cooperative during the mental health assessments support the finding that he would be able to "respond appropriately to supervision, co-workers and work situations."

The ALJ also noted that Plaintiff engaged "in a relatively full complement of daily activities," including performing odd jobs (Tr. 30).   While Plaintiff faults the ALJ for putting undue emphasis on the ability to perform part-time skilled work, the ALJ did not err in noting that the ability to perform skilled work undercut the alleged inability to perform even unskilled work (Tr. 30).  Moreover, while Plaintiff argues, in effect, that doing skilled work on a limited basis does not establish that he had the persistence for full-time work, the ALJ noted that the mental status examination, coupled with Plaintiff's testimony throughout the lengthy hearing supported the finding that he could perform unskilled, "simple, routine, [and] repetitive" tasks on a full-time basis (Tr. 27).   Without more, Plaintiff's ability to perform skilled work also supports a finding that he could "understand, carry out, and remember [simple] instructions" as required for a significant range of unskilled work.

My own review of the record supports the ALJ's findings.  Plaintiff's testimony that he was able to participate in the care of his infant twins, do laundry chores, and work two hours a day as a music producer undermines his claims that he is unable to perform unskilled work (Tr. 73, 105-106).   The treating records showing a mostly unremarkable physical condition following the June, 2012 surgery also stand at odds with Plaintiff's allegations of disability.   Likewise, the mental health treating records reflect no "indication" of any form

of "serious mental illness" (Tr. 784), full orientation, good memory, and organized thoughts (Tr. 808-809, 1035).

Because the determination that Plaintiff was not disabled is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons,  I recommend that Defendant's Motion for Summary Judgment [Docket #18] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #15] be DENIED.

Any objections to this Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: January 29, 2019


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 29, 2019, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen
